IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| TIMMY CAMPBELL, | ) | |
|        Plaintiff, | ) | |
| | ) | Civil Action No. 4:13-cv-00050 |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | By:    Joel C. Hoppe |
|        Defendant. | ) | United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff Timmy Campbell asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. This Court has authority to decide Campbell's case under 42 U.S.C. §§ 405(g) and 1383(c)(3), and his case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's final decision is supported by substantial evidence and should be affirmed.

### I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four.

*Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Campbell filed for SSI on April 28, 2011, because of a torn or broken disc, a torn tendon, a pinched nerve and residual pain, high blood pressure, and vision problems. *See* Administrative Record ("R.") 35, 38–39, 139, 173. At the time, he was 45 years old and had worked for many years in the construction industry. *See* R. 139, 183–90. A state agency denied Campbell's application initially in June 2011, R. 51, and upon reconsideration in August 2011, R. 60.

Campbell appeared with counsel at a hearing before an Administrative Law Judge ("ALJ") on June 26, 2012. R. 29. He testified as to the alleged impairments related to his neck and right arm, R. 40, and to the limitations those impairments caused in his daily activities, R. 34–43, 47. A vocational expert ("VE") also testified as to Campbell's past work and ability to perform other work existing in the national and regional economies. R. 44–49.

In a written decision dated July 13, 2012, the ALJ found that Campbell was not entitled to disability benefits. R. 24. He found that Campbell suffered from two severe impairments: a "right arm impairment ([bi]ceps rupture, status post surgical repair with residual weakness, carpal tunnel syndrome, and neuropathy/polyphasic activity) and neck pain status post cervical spine fusion." R. 16. Neither impairment, alone or combined, met or medically equaled an impairment listed in the Act's regulations. R. 18.

The ALJ next determined that Campbell had the residual functional capacity ("RFC") to perform a limited range of light work.[1] *See* R. 18, 23. Specifically, he found that Campbell could

---

[1] "RFC" is an applicant's ability to work "on a regular and continuing basis" despite his impairments. SSR 96-8p, 1996 WL 374184, at *1 (Jul. 2, 1996). The RFC takes into account "all

3

frequently lift and carry ten pounds, occasionally lift and carry twenty pounds, occasionally push, pull, and reach in any direction with the right upper extremity, and occasionally handle and finger objects. R. 18. The ALJ noted that this RFC ruled out Campbell's return to his past jobs as an "electrician helper and carpenter." R. 23.

Finally, relying on the VE's testimony, the ALJ concluded that Campbell was not disabled after April 28, 2011, because he still could perform one occupation that existed in significant numbers nationally and in Virginia—a furniture rental consultant. R. 23. The Appeals Council declined to review the ALJ's decision on August 13, 2013, R. 1–2, and this appeal followed.

### III. Facts

Campbell's medical records document a history of degenerative changes, chronic pain, and weakness in the neck and dominant (right) upper extremity. On October 24, 2007, Dr. Katrina Murphy, M.D., performed an anterior cervical diskectomy, decompression, and plate fusion at C5-6 to relieve "severe cervical pain" that kept Campbell out of work for several months. *See* R. 428–29. Campbell established care with a second neurosurgeon, Dr. Joel Singer, M.D., at Southside Neurosurgical Associates in early March 2008. *See* R. 340. A contemporaneous imaging study "demonstrated good [cervical plate] fusion at the C5-6 level," an "autofusion at C4-5, and marked cervical spondylosis at C3-4 with bilateral nerve root

---

of the relevant medical and other evidence" in the applicant's record, 20 C.F.R. § 416.945(a), and reflects the "total limiting effects" of his impairments, *id.* § 416.945(e).

"Light work" involves "lifting no more than 20 pounds at a time" but frequently lifting or carrying objects weighing up to ten pounds. 20 C.F.R. § 416.967(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls." *Id.* A person must be able to perform "substantially all of these activities" in order to perform "a full or wide range of light work." *Id.* "If someone can do light work, . . . he or she can also do sedentary work, unless there are additional limiting factors such as [a] loss of fine dexterity or [an] inability to sit for long periods of time." *Id.*

cutoffs." *Id.* On March 3, 2008, Dr. Singer performed another anterior cervical diskectomy and plate fusion, this time at C3-4. *See* R. 340, 343. Campbell did not receive any additional medical care until the summer of 2010. Pl. Br. 3, ECF No. 16.

On July 19, 2010, Campbell established care with Dr. William MacCarty, M.D., at Southern Virginia Orthopedics. R. 305. He reported experiencing "a tearing sensation in his right bicep" while helping someone lift a heavy safe six weeks earlier. *Id.* On exam, Dr. MacCarty noted decreased strength in Campbell's right arm with flexion and extension at the elbow, decreased grip strength in the right hand compared to the left, and tenderness to palpation over the biceps tendon at the elbow and proximal forearm. *Id.* A magnetic resonance imaging scan ("MRI") of Campbell's elbow confirmed a "suspect[ed] distal right biceps rupture." R. 304, 305, 308. Dr. MacCarty performed surgery to repair the ruptured tendon on August 10, 2010. R. 309.

Campbell saw Dr. MacCarty several times in the six months following his surgery. *See* R. 302–03 (Aug. 2010); R. 318–19 (Sept. 2010); R. 317 (Feb. 2011). Although Campbell often complained of pain on these visits, Dr. MacCarty generally found that Campbell was healing as expected and that his motion and strength were "gradually coming" along with gentle therapy[2] and Percocet as needed. *See* R. 302, 317, 318, 319. On February 9, 2011, Dr. MacCarty noted that Campbell's right arm was still weak, particularly with elbow flexion. R. 317.

On April 13, 2011, Campbell told Dr. MacCarty that he could not lift with his right arm. *See* R. 316. Dr. MacCarty observed that Campbell's right arm had "good motion" but was "definitely very weak" compared to the left. *Id.* He gave Campbell a steroid injection and

---

[2] Contemporaneous physical therapy notes document a focus on increasing strength and range of motion in the right upper extremity through "very gentle light stretching" and light weightlifting exercises. *See generally* R. 861, 863, 866, 869, 877–81. On October 19, 2010, for example, the physical therapist instructed Campbell to use a five-pound bag when doing his exercises. R. 866. Campbell was discharged from therapy for attendance problems in early November 2010. *See* R. 860.

instructed him to return as needed. *Id.* Dr. MacCarty also gave Campbell a note certifying that he was "unable to return to work[] from 4/11/11 thru permanently." R. 320. Campbell filed for disability benefits one week later.

Campbell returned to Dr. MacCarty's office on July 7, 2011, "for complaints related to his right arm," including chronic elbow pain and recent onset "numbness and tingling" in the right upper extremity. R. 328. He told Dr. MacCarty that his disability application had been rejected because the agency said "he had normal function and strength in his right arm." *Id.* Dr. MacCarty opined that this was "definitely not true," as his April 13, 2011, treatment note documented "significant weakness of elbow flexion on the right" and "a 50% permanent physical impairment of [Campbell's] right upper extremity secondary to his problems there." *Id.*

On exam, Dr. MacCarty observed that Campbell's right elbow was "very weak." *Id.* Campbell also had "some weakness of [the] median innervated muscles in the hand, . . . a positive Tinel's at the wrist, and a positive Phalen's test in less than 10 seconds."[3] *Id.* He affirmed his previous assessment of Campbell's right-arm impairment and noted a new "concern[] about a nerve impingement in [the] right upper extremity . . . and perhaps at the carpal tunnel level and perhaps more proximally if not both." *Id.* Dr. MacCarty wrote Campbell a prescription for Vicodin and arranged for diagnostic studies on his right wrist and hand.

Campbell underwent electromyography ("EMG") and nerve conduction studies on August 2, 2011. R. 333. The reviewing physician, Victor Owusu-Yaw, M.D., noted that the

---

[3] A Phalen's test, or "Phalen's sign," is a diagnostic test for carpal tunnel syndrome in which the patient holds the "wrists in full flexion with the dorsal surfaces of both hands pushing against each other with fingers pointing downwards for 30–60 seconds. This man[euver] increases pressure on the median nerve: tingling and numbness or pain in the thumb, index, middle, and ring fingers suggests carpal tunnel syndrome." Oxford Concise Medical Dictionary 560 (8th ed. 2010). A Tinel's sign is a "method for checking the regeneration of a nerve[,] usually used in patients with carpal tunnel syndrome. Direct tapping over the sheath of the nerve elicits a distal tingling sensation . . . , which indicates the beginning of regeneration." *Id.* at 734.

6

EMG revealed "[m]ild to moderate right carpal tunnel syndrome-sympthoatic," "[m]ild right ulnar neuropathy at the elbow," and "[m]ild chronic polyphasic activity in the triceps, . . . [and] right C6-7 distribution consistent with . . . cervical radiculopathy for which [Campbell] had [a] surgical decompression." *Id.* On August 10, 2011, Dr. MacCarty explained that the electrical study results were positive for carpal tunnel syndrome ("CTS") and cubital tunnel syndrome, which was consistent with positive Tinel's and Phalen's tests on the right wrist. R. 640. He switched Campbell back to Percocet and recommended that he undergo a "right carpal tunnel release with neurolysis and an ulnar nerve neurolysis and anterior transposition at the right elbow."[4] *Id.* An office note shows that the surgery originally set for August 16, 2011, was rescheduled several times at Campbell's request. *See* R. 638.

Campbell returned to Dr. MacCarty's office on October 7, 2011, "to reevaluate the situation with his right arm." R. 639. He reported experiencing "significant pain from his distal biceps," even on Percocet. *Id.* Dr. MacCarty agreed to continue pain medication and to reschedule surgery to accommodate "some family issues" that Campbell was having at the time. *Id.* He refilled Campbell's Percocet on this visit and again on February 15, 2012. R. 639, 636.

Campbell saw Dr. MacCarty again on March 9, 2012. R. 629. He reported experiencing constant, moderate burning pain in his right elbow radiating into his right arm, hand, and fingers since his biceps surgery in August 2010. *See* R. 629. "Movement and contact" exacerbated the elbow pain, while grasping and bending the wrist increased the pain and numbness in his right

---

[4] The ulnar nerve is "one of the major nerves in the arm. It originates in the neck, from spinal roots of the last cervical and first thoracic divisions, and runs down the inner side of the upper arm to behind the elbow. In the forearm it supplies the muscles with motor nerves; lower down it divides into branches that supply the skin of the palm and fourth and fifth fingers." Oxford Concise Medical Dictionary at 758. "Neurolysis" is the artificial "destruction or dissolution of nerve tissue" to temporarily or permanently relieve pain or spasticity. Dorland's Illustrated Medical Dictionary 1285 (31st ed. 2007).

7

wrist and hand. *Id.* On exam, Dr. MacCarty noted for the first time "tenderness" and "abnormal" range of motion in Campbell's neck. R. 631. He also noted tenderness on palpation of the right ulnar notch, "abnormal" flexion and pronation in the right elbow, a positive Tinel's sign in the right elbow and wrist, and a positive Phalen's test in the right wrist. *Id.*

Dr. MacCarty diagnosed Campbell with chronic right-sided CTS and chronic right-sided ulnar neuropathy that were "not controlled" by narcotic pain medication. *Id.* He also expressed frustration over seeing Campbell "many times for these issues" only to have him "repeatedly cancel[] surgery once pain medication was refilled." *Id.* Dr. MacCarty warned that Campbell would be discharged from his practice if he cancelled again. R. 632. Campbell agreed to have hand surgery in late April or early May 2012. *See id.*

In late March 2012, Campbell reestablished care with Dr. Singer. R. 599. He reported experiencing severe left-sided neck pain with right-arm weakness for the past four months, which he had tried to treat with ibuprofen, aspirin, and a heating pad. *Id.* On exam, Dr. Singer noted that Campbell's "deltoids [were] good, but his biceps, brachioradialis, supraspinatus and infraspinatus, and finger extensors on [the] right [were] weak." *Id.* Dr. Singer prescribed Lortab for pain and scheduled an MRI of Campbell's cervical spine. *See id.*

The MRI was conducted on April 5, 2012. *See* R. 521–22. Dr. Christopher Belk, M.D., who, in February 2008, had reviewed an MRI of Campbell's cervical spine, R. 525, cautioned that his evaluation of the current image was "limited due to extensive fusion plate and probable screws anterior to the cervical spine" that "appear[ed] to extend from C3 to C7." R. 521. From what he could see, Dr. Belk noted "mild uncovertebral joint hypertrophy" and a "small disc-osteophyte complex at C7-T1," but no "significant disc protrusion" or "mass effect on the spinal cord." R. 522.

On April 12, 2012, Dr. Singer sent Campbell to Dr. Maurice Bell, M.D., for a pain-management consultation and C5-6 epidural steroid injection. *See* R. 570. Campbell reported that he did not experience "any improvement" after his October 2007 spinal fusion at C5-6, but that Dr. Singer "fix[ed] his neck" with the C3-4 spinal fusion in March 2008. *Id.* Dr. Bell noted that Campbell "ha[d] done great until the last few months" when he started experiencing pain in his neck and left shoulder and intermittent numbness in the left arm, hand, and fingers. *Id.* Dr. Bell performed a steroid injection and scheduled Campbell to return in one month in case the injection needed to be repeated.[5] *See id.*

Campbell saw Dr. MacCarty on May 2, 2012, for a pre-operative physical. R. 755–60. On exam, Dr. MacCarty noted tenderness and abnormal range of motion in Campbell's neck, "moderate isolated weakness" in the right hand, "grade 4" biceps strength, a "deformity" in the right elbow, positive Tinel's signs in the right elbow and wrist, and a positive Phalen's sign in the right wrist. R. 758. Dr. MacCarty diagnosed generalized pain, right-sided CTS, and right-sided ulnar neuropathy—all of which were "chronic" and "not controlled" by narcotic pain medication. R. 759.

Campbell underwent a "right carpal tunnel release with neurolysis and ulnar nerve neurolysis and anterior transposition at the elbow" on May 7, 2012. R. 761. He was discharged home the same day in an arm sling and with narcotic pain medication. *See* R. 778, 827. Campbell saw Dr. MacCarty on May 10 for his first post-operative check up. *See* R. 612. Dr. MacCarty's

---

[5] Campbell returned to Dr. Singer's office on May 3, 2012, to report that the epidural block did not help the severe pain in his left arm. R. 601. Reviewing the April 5, 2012, MRI results, Dr. Singer could not see "exactly where [Campbell's] pain [was] coming from," but he suspected that it was related to C5-6. *Id.* Dr. Singer indicated that he would see Campbell back in the office after further diagnostic imaging studies. *Id.* Dr. MacCarty's May 2, 2012, pre-operative note shows that Campbell was "due to have neck surgery" by Dr. Singer following his upcoming hand surgery. R. 760.

9

examination of Campbell's right elbow, wrist, and hand was normal, R. 612–14, with the exception of pain with resisted flexion of the right wrist, R. 613. He urged Campbell to "move his fingers and elbow to avoid stiffness," but instructed that "he [was] to do nothing heavy." *Id.*

Campbell returned to Dr. MacCarty's office on May 17, 2012, having removed the sutures from his hand and surgical staples from his elbow against medical advice. *See* R. 606. Dr. MacCarty told Campbell that he was "way out of line," and that he was lucky he had not seriously injured himself. *Id.* On exam, Dr. MacCarty noted "abnormal" range of motion in Campbell's right hand and fingers. R. 607. Dr. MacCarty diagnosed Campbell with chronic uncontrolled generalized pain. *Id.* He also refilled Campbell's Percocet and indicated that Campbell would start "occupational therapy for mobilization of his elbow and wrist." *Id.*

   2.   *Medical-Source Opinions*

The record contains relevant opinions from Dr. MacCarty and two state agency reviewing physicians. Dr. MacCarty's opinions dated before April 13, 2011, essentially state that Campbell was "unable to return to work," or unable to return to his past construction jobs, following surgery to repair his ruptured right bicep in August 2010. *See* R. 316, 317, 320–22. On April 13, 2011, Dr. MacCarty also opined that Campbell suffered "a 50% permanent physical impairment secondary to his injury in surgery." R. 316.

State agency physician Dr. Juan Astruc, M.D., reviewed Campbell's SSI application on June 27, 2011. *See* R. 51, 56–57. Dr. Astruc found that Campbell had a muscle or joint disorder, but he determined that it was not "severe" because Campbell had "good movement and strength" in his right upper extremity following surgery to repair his biceps tendon. R. 55–57, 59. Dr. MacCarty noted his disagreement with this assessment, which he characterized as finding "normal function and strength in his right arm." *See* R. 328.

Case 4:13-cv-00050-JLK-JCH   Document 20   Filed 11/20/14   Page 10 of 28   Pageid#: 1010

State agency physician Dr. James Darden, M.D., reconsidered Campbell's application in mid-August 2011. *See* R. 69. Based on his review of updated medical records available through August 9, 2011, Dr. Darden opined that Campbell suffered from severe CTS and a severe dysfunction of a major joint. *See* R. 62, 65–66. Dr. Darden wrote that Campbell was "still able to use [his] arm to perform basic activities and [had] full movement of [his] left arm." R. 71. As to specific limitations, Dr. Darden found that Campbell could lift, carry, push, and pull up to ten pounds frequently and up to twenty pounds occasionally. *See* R. 68–69. Campbell could occasionally reach in front, laterally, and overhead with his right arm. *Id.* Dr. Darden also found that Campbell had "unlimited" gross and fine-motor function despite suffering from severe CTS. *See* R. 66, 69.

On September 12, 2011, Dr. MacCarty wrote a letter to Campbell's attorney giving his opinion of Campbell's condition at that time. R. 335. Dr. MacCarty opined that Campbell had "fairly limited use of his right upper extremity" and "cannot lift heavy objects." *Id.* He also noted "evidence of nerve impingement in both hands and the elbow which limits [Campbell] in terms of dealing with small objects, such as coins." *Id.* Dr. MacCarty confirmed that Campbell had experienced "chronic pain" in his right upper extremity since his biceps injury in 2010, and he expected "to a certain extent that [this pain] will be permanent." *Id.*

Dr. MacCarty expressed several opinions about Campbell's CTS, ulnar neuropathy, and generalized pain in May 2012. *See* R. 607, 612–14, 759. On May 2, five days before Campbell's hand surgery, Dr. MacCarty opined that these chronic conditions were "not controlled" by narcotic pain medication. R. 759. On May 10, Dr. MacCarty opined that Campbell "ha[d] the expected amount of pain" three days after surgery, R. 612, and that his chronic CTS and ulnar neuropathy were now "controlled." R. 614. He urged Campbell to "move his fingers and elbow

11

to avoid stiffness," but instructed that "he [was] to do nothing heavy." *Id.* On May 17, Dr. MacCarty noted "abnormal" range of motion in Campbell's right hand and fingers, as well as pain with range of motion in the right wrist. R. 607. He diagnosed Campbell with chronic generalized pain that was "not controlled" by surgery and narcotic pain medication. R. 608.

The next day, Dr. MacCarty completed a Work Related Limitations Form assessing how Campbell's impaired right upper extremity affected his physical capabilities. R. 889–93. Based on his examinations, R. 889, Dr. MacCarty opined that Campbell: (1) could lift fewer than ten pounds with his right arm; (2) could "frequently" lift two pounds with his right arm; (3) could "occasionally" push and pull; (4) was "limited" in his ability to reach in all directions; (5) had "limited" gross- and fine-motor function; and (6) could not return to his past work; but (7) could perform "sedentary work [that] involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." R. 889–93.

B.     *Campbell's Statements*

On May 20, 2011, Campbell reported constant, unabated "aching, stabbing, burning, throbbing, cramping, [and] crushing" pain in his right arm. R. 191, 192. The pain moved up and down that extremity, but it was particularly bad in "the joint of [his] right arm where [the] main bicep tendon was torn." R. 191, 192. At the time, Campbell needed help bathing, dressing, and tying his shoes. R. 194. He did not prepare meals, tend to the family dog, do yard work, go shopping, regularly engage in activities outside the home, or tend to household chores more demanding than dusting for two hours each week. R. 195, 196, 197. He was able to drive independently, however. R. 196. Campbell also reported difficulty lifting and reaching with the right arm, R. 192, as well as difficulty grasping and holding objects with the right hand, R. 198.

12

He was still able to write with his right (dominant) hand. R. 170. Campbell estimated that he could lift between ten and fifteen pounds. R. 198.

At his administrative hearing in June 2012, Campbell testified that his primary impairments were shooting pain in his neck and constant, severe pain, numbness, and weakness in his dominant (right) upper extremity. *See* R. 40, 42. He explained that he stopped working as an electrician's helper in August 2008 because he was "having neck problems" after two surgeries to relieve pinched nerves, R. 35, and that he still had difficulty looking down and turning his head to the left, R. 38. As for his right arm, Campbell testified that he could lift and hold "two or three pounds" for a "few minutes" at a time, but that he could not write with his right (dominant) hand. R. 39, 42. Campbell reported no problems with his left upper extremity and said he could lift about sixteen pounds with that arm. *See* R. 42.

### IV. Discussion

Campbell primarily objects to the ALJ's finding that he can perform light work. *See* Pl. Br. 18–23. He argues that an RFC for light work conflicts with the ALJ's finding that Campbell has "limited" use of one arm. *See id.* at 18–19. Campbell also argues that the ALJ erred in evaluating Dr. MacCarty's May 18, 2012, opinion that Campbell is limited to "sedentary work," as well as Campbell's statements describing his disabling pain and functional limitations. *See id.* at 21–23. He asks the Court to reverse the Commissioner's decision and to award benefits in light of the VE's testimony that no sedentary occupation could accommodate Campbell's occasional manipulative limitations. *Id.* at 23 (citing R. 45, 49). Campbell also objects to the ALJ's conclusion that there are a "significant number" of furniture rental consultant jobs available in the national or regional economies. *See id.* at 23–24.

A.    *Light Work*

Campbell first argues that a RFC "limiting" the use of his right arm disqualifies him from light work because that work "requires frequent use of the arms." Pl. Br. 18. In support of this argument, Campbell cites select portions of a policy statement describing the physical abilities needed to perform the full range of light work. *See id.* at 18–19 (citing SSR 83-10, 1983 WL 31251, at *3, *5 (Jan. 1, 1983)). The ALJ, however, did not find that Campbell could perform substantially all "light work" as that term is defined in the regulations. *See* R. 18, 23. Relying on the VE's testimony, the ALJ found that Campbell could perform one light occupation despite having only "occasional" (*i.e.*, "limited") use of his dominant arm and hand.[6] *See* R. 23.

Campbell does not need two fully functioning upper extremities to perform light work. *See, e.g.*, *Reynolds v. Astrue*, 390 F. App'x 612, 612 (8th Cir. 2010) (per curiam) (substantial evidence supported ALJ's finding that a left-arm amputee could perform a limited range of light work); *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000) (substantial evidence supported ALJ's finding that amputee could perform specific light jobs with remaining arm and hand); *Thomas v. Comm'r, Soc. Sec. Admin.*, Civil No. SAG-11-3683, 2013 WL 66538, at *1 (D. Md. Jan. 2, 2013) (same). Rather, he must be able to lift and carry twenty pounds (and ten pounds frequently) with one arm plus "do a good deal of walking *or* standing, *or* do *some* pushing and pulling of arm *or* leg controls while sitting." *Hayes v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990) (emphasis added); *accord* 20 C.F.R. § 416.927(b).

---

[6] "'Occasionally' means occurring from very little up to one-third of the time." SSR 83-10, at *5. "Many unskilled light jobs . . . require use of arms and hands to grasp and to hold and turn objects, [but] they generally do not require use of the fingers for fine activities to the extent required in much sedentary work." *Id.* at *6. In this case, the VE testified that "furniture rental consultant" is an unskilled light occupation that requires "occasional" handling, reaching, and fingering. R. 45.

The ALJ found that Campbell could meet these weight-lifting requirements, but could only "occasionally" reach, push, pull, handle, and finger with his dominant right arm and hand. *See* R. 18. Campbell has not alleged that his left arm is impaired or that he has difficulty sitting, standing, or walking. *See, e.g.*, R. 42, 198; *accord* Pl. Br. 22 (noting Campbell's testimony "that he has no limitations with his left side and [that] he can lift well with his left side"). Thus, the ALJ's findings as to Campbell's manipulative limitations are not inconsistent with an RFC for a limited range of light work. *See, e.g.*, *Silverman v. Comm'r, Soc. Sec. Admin.*, Civil No. WMN-13-1388, 2014 WL 671402, at *1–2 (D. Md. Feb. 19, 2014) (substantial evidence supported ALJ's finding that a person with "normal left-arm functioning" could perform light work that involved "no overhead lifting[,] and occasional grasping, handling, pushing/pulling, and fingering" with the dominant right arm); *Horner v. Astrue*, No. 1:08cv152, 2009 WL 394410, at *27, *34 (E.D. Va. Feb. 17, 2009) (substantial evidence supported ALJ's finding that a person with "limited ability to push/pull with the dominant upper extremity" and inability to reach overhead with dominant arm could perform light work).

B.    *Medical Opinions*

Campbell next argues that the ALJ should have given "greater weight" to Dr. MacCarty's May 18, 2012, opinion that Campbell should be limited to sedentary work. *See* Pl. Br. 22–23. He objects that the ALJ blindly "relied [on] and adopted" Dr. Darden's August 2011 RFC assessment for light work even though it was contrary to Dr. MacCarty's opinion. Pl. Br. 17.

ALJs must weigh each medical opinion in the applicant's record. 20 C.F.R. § 416.927(c). "Medical opinions are statements from physicians . . . that reflect judgments about the nature and severity of [the applicant's] impairment(s), including [his] symptoms, diagnosis and prognosis,

Case 4:13-cv-00050-JLK-JCH   Document 20   Filed 11/20/14   Page 15 of 28   Pageid#: 1015

what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions."[7] 20 C.F.R. § 416.927(a)(2). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency reviewers. *See* 20 C.F.R. § 416.927(c). A treating-source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. § 416.927(c)(2).

"If not entitled to controlling weight, the value of the opinion must be weighed and the ALJ must consider" the factors listed in section 416.927(c), such as the treating source's medical specialty, the weight of the evidence supporting the opinion, and the opinion's consistency with other relevant evidence in the record. *See Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam). These factors may "provide specific and legitimate grounds to reject a treating physician's opinion" if the record contains "persuasive contrary evidence." *Mastro*, 270 F.3d at 178. The ALJ also may rely on a non-examining physician's opinion when it is consistent with the record or when treating-source and examining-source opinions conflict with each other. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

The ALJ must explain the weight given to all medical opinions, 20 C.F.R. § 416.927(e)(2)(ii), and must "give good reasons for" the weight assigned to any treating-source medical opinion, *id.* § 416.927(c)(2). Finally, if the ALJ's RFC assessment conflicts with a

---

[7] Medical opinions are distinct from medical-source opinions on issues reserved to the Commissioner, such as whether the applicant is "disabled" or "unable to work." 20 C.F.R. § 416.927(d)(1). Although the ALJ must consider a physician's "legal conclusions" as he would any relevant evidence, *Morgan v. Barnhart*, 142 F. App'x 716, 722 (4th Cir. 2005), he need not give "any special significance" to a medical-source opinion on a legal issue that might dispose of the applicant's case. 20 C.F.R. § 416.927(d); *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (noting that the applicant's final RFC is an issue reserved to the Commissioner that must be based on all relevant evidence in the record).

medical opinion, he must explain why that opinion was not adopted in full. *Davis v. Colvin*, No. 4:13cv35, slip op. at 6 (W.D. Va. Jul. 14, 2014) (Hoppe, M.J.), *adopted by* 2014 WL 3890495 (Aug. 7, 2014) (Kiser, J.). His decision must be sufficiently specific to make clear to subsequent reviewers the weight he gave to the opinion(s) and the reasons for that weight. *Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013). As always, the ALJ's choice between conflicting evidence must be supported by substantial evidence in the record. *See id.*

    *1.    The ALJ's Findings*

The ALJ gave "the greatest weight" to Dr. Darden's August 2011 opinion that Campbell could perform light work if he only "occasionally" reached in any direction with his right arm. R. 22. The ALJ found this opinion to be "balanced, objective, and consistent with the evidence of record as a whole." R. 22. He further explained that Dr. Darden's opinion "clearly reflect[ed] a thorough review of the record and [was] supportable" even though he did not examine Campbell. *Id.* The ALJ's RFC assessment is more restrictive than Dr. Darden's opinion in that it limits Campbell to "occasional handling and fingering" and "occasional" pushing and pulling with the right arm regardless of the weight involved. *Compare* R. 18, *with* R. 68–69. It is consistent with Dr. Darden's opinion that Campbell could perform light work after April 28, 2011. R. 66, 68.

"Less weight [was] given" to Dr. Astruc's finding in June 2011 that Campbell did not have a severe impairment. R. 22, 56–57. The ALJ explained that Dr. Astruc "did not have access to the latest evidence as to the current level of [Campbell's] impairments." R. 22.

"Less weight [was] also given to the . . . treating/examining source opinion contained in the report." R. 22. Presumably, "the report" refers to the Work Related Limitations Form that Dr. MacCarty completed on May 18, 2012. *See* R. 22, 889–93. The ALJ also considered Dr. MacCarty's statements dated April 13, 2011; July 7, 2011; and September 12, 2011, and three

work release notes dated September 29, 2010; February 9, 2011; and April 13, 2011. *See* R. 22 (citing R. 316, 320–22, 328, 335).

The ALJ accepted "Dr. MacCarty's opinion that [Campbell] could not return to his prior work in heavy construction [as] consistent with" his own RFC assessment, but found that the "the functional limitations he opined [*sic*] essentially adopt[ed] the claimant's statements without balance or objectivity." *Id.* He also found that Dr. MacCarty's "opinion . . . [was] not consistent with the other medical evidence of record as a whole." *Id.* The ALJ did not explain these findings or cite specific inconsistencies in the medical evidence. *See id.*

The ALJ's RFC is less restrictive than Dr. MacCarty's May 18, 2012, opinion in that it provides that Campbell can perform at least a limited range of light work after April 28, 2011. *Compare* R. 18, *with* R. 892. It is consistent with Dr. MacCarty's opinions that Campbell had "fairly limited use of his right arm," R. 335, could only "occasionally" push or pull, and had "limited" bilateral gross-motor and fine-motor function during the relevant period. *Compare* R. 18, *with* R. 335, 607, 892.

      2.     *Analysis*

Campbell argues that the ALJ "failed to consider" Dr. MacCarty's opinion in light of their long-term treating relationship. *See* Pl. Br. 17, 22. He also suggests that Dr. MacCarty's opinion was entitled to controlling weight simply because he was Campbell's treating physician. *See id.* (stating that a treating physician's opinion "may not be discounted by the ALJ" (citing *Oppenheim v. Finch*, 495 F.2d 396 (4th Cir. 1974); *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971)).[8] These arguments are without merit. The ALJ acknowledged that Dr. MacCarty was

---

[8] *Oppenheim* and *Vitek* stand for the proposition that a treating physician's opinion that the claimant is "totally disabled" or "unable to work," while not binding on agency adjudicators, "is entitled to great weight" simply because it is from a treating source. *Oppenheim*, 495 F.2d at

Campbell's treating physician and recognized that his medical opinions might be entitled to controlling weight under the regulations. *See* R. 22. He simply disagreed that all of Dr. MacCarty's opinions were well supported by clinical evidence and not inconsistent with other substantial evidence in Campbell's record. *See id.*

The ALJ certainly made errors when evaluating Dr. MacCarty's medical opinions. For example, he did not adequately explain why Dr. MacCarty's opinions were inconsistent with the other medical evidence in Campbell's record, R. 22. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 693 (W.D. Va. 2009) (noting that the ALJ may assign little or no weight to a treating-source opinion "if he sufficiently explains his rationale and if the record supports his findings"). Nor is it clear why the ALJ gave Dr. MacCarty's opinions "less weight" when his final RFC reflects Dr. MacCarty's opinions—and rejects Dr. Darden's contrary opinions—that Campbell had a "limited" ability to push, pull, handle, and finger with his right upper extremity. *Compare* R. 18, *with* R. 335, 889, 890, *and* R. 68–69. These errors do not warrant reversal and remand, however, because they are harmless. *See Kersey*, 614 F. Supp. 2d at 697 ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

The only portion of Dr. MacCarty's May 18, 2012, opinion that the ALJ arguably rejected is Dr. MacCarty's statement that Campbell should be limited to "sedentary work." The ALJ's rationale for that decision "is conclusory and poorly reasoned, but it is supported by

---

398; *Vitek*, 438 F.2d at 1160. This rule, commonly called the "Fourth Circuit treating physician rule," was superseded by regulation in August 1991. *Ward v. Chater*, 924 F. Supp. 53, 55–56 (W.D. Va. 1996) ("[T]his court concludes that 20 C.F.R. § 416.927(d)(2) supersedes the Fourth Circuit treating physician's rule.") (citing the current 20 C.F.R. § 416.927(c)(2))); *see also* 20 C.F.R. § 416.927(d) (noting that a treating physician's opinion that the claimant is "disabled" or "unable to work" is neither a medical opinion nor entitled to special weight). Campbell does not argue that Dr. MacCarty's opinions are entitled to controlling weight under the current regulations. *See* Pl. Br. 22–23.

substantial evidence" in the record. *Shamlee v. Astrue*, No. 2:09cv290, 2010 WL 2187643, at *8 (E.D. Va. May 28, 2010), *adopted by* 2010 WL 3187609, at *3 (Aug. 11, 2010); *accord Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011) (noting that an ALJ's failure to explain his findings is harmless "as long as the record provides an adequate explanation of the Commissioner's decision" (internal quotation marks and brackets omitted)).

Dr. MacCarty simply checked the "sedentary work" box when asked to identify the level of work he thought Campbell could perform. While the "check box" format does not necessarily render the opinion of "limited probative value," Def. Br. 16–17, this particular opinion is neither supported by Dr. MacCarty's own treatment notes nor consistent with other evidence in Campbell's record. *Compare Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (substantial evidence supported ALJ's decision to reject treating physician's conclusory opinion where the opinion was not supported by the physician's own treatment notes and was inconsistent with other evidence in the record), *with Lawson v. Colvin*, --- F. Supp. 2d ---, 2014 WL 1870853, at *6 (W.D. Va. May 8, 2014) (substantial evidence did not support ALJ's decision to reject treating physician's "check box" opinion where the opinion was supported by clinical evidence, including the physician's own treatment notes, and was not inconsistent with other evidence in the record).

As explained above, limiting Campbell to sedentary work assumes that he cannot perform light work, which involves lifting twenty pounds (and ten pounds frequently) with *either* upper extremity. *See Reynolds*, 390 F. App'x at 612; *Carey*, 230 F.3d at 146; *Silverman*, 2014 WL 671402, at *1; *Thomas*, 2013 WL 66538, at *1. Dr. MacCarty often made findings consistent with his May 18, 2012, opinion that Campbell could not lift more than ten pounds with his right arm. *See, e.g.*, R. 316 (Apr. 2011); 328 (July 2011); R. 640 (Aug. 2011); R. 335

20

(Sept. 2011); R. 631 (Mar. 2012); R. 607, 614, 758–59 (May 2012); *accord* R. 866 (Oct. 19, 2010, physical therapy record noting that Campbell "did well" lifting a four-pound weight with his right arm). But there is no evidence in Dr. MacCarty's notes suggesting that Campbell's left arm is similarly impaired. For example, Dr. MacCarty noted in March and May 2012 that Campbell's left upper extremity exams were normal without evidence of atrophy, weakness, deformity, restricted range of motion, or loss of feeling. *See* R. 607, 623–24, 631.

In April 2011, Dr. MacCarty told Campbell that he "could only rate the problem with [Campbell's] right upper extremity," which is the arm he operated on in August 2010. R. 316. Over the next year, Dr. MacCarty ordered imaging studies, made diagnoses, recommended and performed surgery, and restricted Campbell's use of his right upper extremity. *See, e.g.*, R. 328 (July 2011); R. 333, 640 (Aug. 2011); R. 335 (Sept. 2011); R. 607, 612–14, 759 (May 2012). He did not do the same for Campbell's left upper extremity.

Finally, Campbell never complained to Dr. MacCarty about pain, weakness, or decreased function in his left upper extremity.[9] *See, e.g.*, R. 328 (July 2011); R. 629 (Mar. 2012); R. 606–07, 613, 621–22 (May 2012). Campbell also told the agency in May 2011 and June 2012 that he had no difficulty with his left upper extremity and could lift roughly sixteen pounds with that arm. *See* R. 198, 40; *accord* Pl. Br. 22 (noting Campbell's testimony "that he has no limitations with his left side and [that] he can lift well with his left side").

Thus, Dr. MacCarty's failure to explain why Campbell is limited to sedentary work "provide[s] specific and legitimate grounds to reject [that] opinion in the face of conflicting evidence," *Mastro*, 270 F.3d at 178, including Dr. MacCarty's longitudinal treatment notes,

---

[9] In April and May 2012, Campbell reported to two other physicians that he was experiencing recent onset "severe pain" and "intermittent numbness" in his left upper extremity. R. 570, 601. However, he did not say that these symptoms interfered with lifting or carrying, and neither physician restricted Campbell's activity based on his complaints. *See* R. 570, 601.

Campbell's failure to report symptoms that might support this opinion, and Dr. MacCarty's lifting restriction for only Campbell's right arm. *See* 20 C.F.R. § 416.927(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."); *id.* § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion."); *Craig*, 76 F.3d at 590; *Chestnut v. Colvin*, No. 4:13cv8, 2014 WL 2967914, at *3–4 (W.D. Va. June 30, 2014) (Kiser, J.) (substantial evidence supported ALJ's decision to reject treating physician's conclusory opinion on the severity of plaintiff's seizure disorder where that opinion was inconsistent with the physician's treatment notes and the plaintiff's statements to multiple healthcare providers).

Dr. Darden, the state agency physician who reviewed Campbell's medical records through August 9, 2011, opined that Campbell had some use of his right arm and full use of his left arm, which allowed him to perform "light work with limitations [o]n the right arm." R. 66, 71. The ALJ may rely on a non-examining physician's functional assessment when that assessment is consistent with the record. *Gordon*, 725 F.2d at 236. Dr. Darden's opinion that Campbell could perform light work is consistent with Campbell's own testimony that he had no problem with his left upper extremity and could lift roughly sixteen pounds with that arm. *See* R. 42; *accord* Pl. Br. 22 (noting Campbell's "very credible" testimony that he has "no limitations with his left side and [that] he can lift well with his left" upper extremity). It is also consistent with treatment notes from three different physicians dated between August 10, 2011 and May 17, 2012, none of which restricted Campbell's ability to lift and carry objects with his left upper extremity. *See* R. 570, 599, 601, 607, 612–14, 629–32, 639, 640, 755–60. Accordingly, I find that substantial evidence supports the ALJ's decision to discount Dr. McCarty's opinion.

22

C.      *Campbell's Credibility*

Campbell also argues that the ALJ's reasons for discrediting his complaints of debilitating pain are "irrational" and "contrary to the record." Pl. Br. 19. The Fourth Circuit recently reminded reviewing courts that they should defer to an ALJ's credibility finding absent "exceptional circumstances." *Bishop v. Comm'r of Soc. Sec.*, --- F. App'x ---, 2014 WL 4347190, at *2 (4th Cir. Sept. 3, 2014) (citing *Edelco, Inc. v. NLRB*, 132 F. 3d 1007, 1011 (4th Cir. 1997)). "Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Edelco*, 132 F.3d at 1011. In *Bishop*, the Fourth Circuit found that substantial evidence supported the ALJ's adverse credibility determination because he applied the correct legal standard, "cited specific contradictory evidence[,] and averred that the entire record had been reviewed." 2014 WL 4347190, at *2.

Campbell's case is not one of exceptional circumstances.[10] The ALJ first summarized Campbell's statements describing his pain and perceived functional limitations related to chronic "neck and right upper extremity difficulty," R. 19, the two medical impairments that Campbell said prevented him from working, R. 37, 40. *See* 20 C.F.R. § 416.929(c)(3). He then reviewed each available medical record.[11] R. 19–22; *see* 20 C.F.R. § 416.929(c)(2). The ALJ also

---

[10] The ALJ's summary of Campbell's treatment records omits certain evidence that tends to support Campbell's statements, such as his stated reasons for acting against medical advice during the relevant period. *Compare* R. 20–22, *with* R. 47–48, 639. However, the ALJ stated that he considered the whole record, and, absent evidence to the contrary, this Court must take him at his word. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Campbell does not "point to any specific piece of evidence not *considered* by the [ALJ] that might have changed the outcome of his disability claim." *Id.* (emphasis added). As such, I must conclude that the Commissioner's decision was based on the entire record and that the ALJ's failure to expressly mention this evidence was harmless. *See id.*

[11] Although SSI cannot be paid before the date on which the claimant protectively filed his application, the ALJ in this case considered Campbell's "complete medical history consistent

23

considered and weighted medical opinions from Dr. MacCarty, Campbell's treating physician. R. 22; *see* 20 C.F.R. § 416.929(c)(1).

After reviewing this evidence, the ALJ found that Campbell's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms[,]" but that Campbell's statements describing the intensity, persistence, and limiting effects of those symptoms were "not credible" to the extent that they were inconsistent with the ALJ's RFC assessment. R. 21. The ALJ "provided a comprehensive list of reasons," with supporting references to the record, for discrediting Campbell's claim that he cannot work at all. *Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *4 (W.D. Va. Sept. 12, 2014) (Kiser, J.) (finding no legal error where the ALJ "provided a comprehensive list of reasons—and supporting references to the Record—for why he discredited the Plaintiff's testimony").

For example, the ALJ cited Campbell's inconsistent statements about when he stopped working due to his allegedly disabling impairments.[12] *See* R. 21. Courts have long allowed parties to use a witness's prior inconsistent statements to impeach his or her testimony. *See Vest v. Colvin*, No. 5:13cv67, slip op. at 52 (W.D. Va. July 17, 2014) (Hoppe, M.J.) (collecting cases), *adopted by* 2014 WL 4656207, at *2–3 (W.D. Va. Sept. 16, 2014) (Urbanski, J.); *cf. United States v. Hale*, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness."). It was not

___

with 20 C.F.R. § 416.912(d)." R. 14. "Complete medical history" means the records of [the claimant's] medical sources covering at least the 12 months preceding the month in which" he filed his application, unless the claimant alleges an earlier onset date. 20 C.F.R. § 416.912(d)(2). In this case, Campbell alleged an onset date of August 2007, and the ALJ considered all available medical records dated after October 2007. *See* R. 16–18, 19–22, 169.

[12] The ALJ cites Campbell's inconsistent statements about his work history as a reason for discrediting his "allegations of disabling impairments beginning in 2008." R. 21. Although Campbell's alleged onset date is not relevant to whether he was eligible for SSI after April 2011, inconsistent statements are relevant to whether Campbell's other statements were credible. *See* 20 C.F.R. § 416.330; R. 21.

unreasonable for the ALJ to conclude that Campbell's prior inconsistent statements about symptoms that prevented him from working "tend[ed] to reflect poorly on [his] overall credibility," R. 21, even if those statements were not directly relevant to Campbell's eligibility for SSI.

The ALJ also correctly found that Campbell rescheduled his hand surgery four times between August 2011 and May 2012 even though Dr. MacCarty said the procedure would "help him significantly." R. 20, 22, 638, 640. The ALJ should have expressly considered Campbell's reasons for rescheduling his surgery before drawing any negative inferences about Campbell's credibility.[13] *Manteris v. Astrue*, No. 3:10cv34, 2011 WL 1225994, at *2–3 (W.D. Va. Mar. 30, 2011). His imperfect analysis does not undermine his credibility finding completely, however. *See id.* For example, the ALJ correctly noted that Dr. MacCarty grew frustrated with Campbell in March 2012 because Campbell visited the doctor's office "many times for [the same] issues" and "repeatedly cancelled surgery once pain medication was refilled." R. 632. Campbell finally underwent surgery on May 7, 2012, under threat of being discharged from the practice. R. 632. On this record, it was reasonable for the ALJ to conclude that Campbell's "non-compliance with treatment recommendations" after he filed for SSI undermined his claims of disabling pain and functional limitations.[14] R. 22. Based on this record, I cannot find that the ALJ's credibility determination was unreasonable or lacked an adequate basis.

_____

[13] Campbell points out "that he was having personal problems and wanted to schedule [*sic*]. There may have been financial reasons, no [*sic*] personal support reasons." Pl. Br. 21. Treatment notes dated October 7, 2011, show that Dr. MacCarty was willing to reschedule surgery and continue pain medication until January 2012 to accommodate "some family issues" that Campbell has having at the time. R. 639. There is no evidence that these issues were financial. Campbell does not explain why he rescheduled this surgery "once pain medication was refilled," R. 632, on at least four occasions between August 2011 and March 2012. *See* R. 633, 638.

[14] Campbell also objects to the ALJ's finding that "a recent MRI showed no significant disc protrusion and only a small disc-osteophyte complex at C7-T1 without mass effect on the spinal

Case 4:13-cv-00050-JLK-JCH   Document 20   Filed 11/20/14   Page 25 of 28   Pageid#: 1025

D.    *Other Work in the Economy*

Finally, Campbell argues that the Commissioner did not carry her burden at step five of the disability determination process. *See* Pl. Br. 23–24. Once the ALJ found that Campbell could not return to his past work, the burden shifted to the Commissioner to produce evidence that Campbell could perform other work that existed in significant numbers in the national or regional economies. *See Hancock*, 667 F.3d at 472. Here, the VE testified that Campbell could work as a furniture rental consultant, which offered 90,000 jobs nationally and 2,600 jobs in Virginia. *See* R. 44. She also testified that this was a "light" occupation that required only "occasional" reaching, pushing, pulling, handling, and fingering. R. 45. The ALJ cited this testimony in concluding that Campbell was not disabled after April 28, 2011.

Campbell does not object to the ALJ's finding that he could perform the job functions required of a furniture rental consultant. Rather, he argues that the Commissioner did not carry her burden because, if one divides 90,000 and 2,600 by the populations of the United States and Virginia, respectively, Campbell's "chance[s] of obtaining this job . . . are not 'significant.'" Pl. Br. 23–24. This argument is foreclosed by the governing regulations, binding Fourth Circuit

cord." R. 22. He argues that the ALJ's finding was "irrational" because "having two plates and several sections of your spine fused is more convincing for pain than a single disc protrusion and it was not possible to view whether there were disc protrusions under these significant plated fused areas of the spine." Pl. Br. 22. The ALJ did not mention this MRI as a reason for discrediting Campbell's complaints of disabling pain and functional limitations. Even so, the spinal fusion itself does not make Campbell's complaints "more convincing" than his physician's interpretation of the diagnostic image. *See Craig*, 76 F.3d at 595 (noting that the applicant's statements need not be accepted to the extent that they are inconsistent with the available evidence, including objective medical evidence). The ALJ acknowledged that Campbell's neck pain and stiffness had recently returned, and he reasonably found that these symptoms were not disabling. *See Aker v. Colvin*, No. 7:13cv42, 2014 WL 4093769, at *5 (W.D. Va. Aug. 18, 2014) ("'An individual does not have to be pain-free in order to be found not disabled.' . . . Rather, the pain must be so severe as to prevent the claimant from performing any substantial gainful activity." (quoting *Green v. Astrue*, 3:10cv764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011), *adopted by* 2011 WL 5599241 (Nov. 17, 2011))).

precedent, and the presiding District Judge's holdings in two materially indistinguishable cases. *See* 20 C.F.R. § 416.966(c) (claimant's chances of obtaining work that he otherwise could perform are irrelevant); *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (finding that approximately 110 jobs locally was not "an insignificant number" of jobs under the regulations); *Chestnut*, 2014 WL 2967914, at *2 n.4, *10, *10 n.16 (holding that substantial evidence supported the ALJ's conclusion that the claimant was not disabled because she could perform one occupation with 26,609 jobs in the national economy and 920 jobs in her home state); *Carr v. Comm'r of Soc. Sec.*, No. 4:10cv25, 2011 WL 1791647, at *10 (W.D. Va. May 11, 2011) (Kiser, J.) (holding that substantial evidence supported the ALJ's conclusion that the claimant was not disabled because she could perform two occupations with a combined 2,000 jobs available in her home state).

## V. Conclusion

This Court must affirm the Commissioner's final decision that a person is not disabled if the ALJ properly applied the law and substantial evidence in the record supports his factual findings. I find that both requirements were met here. Therefore, I recommend that this Court **DENY** Campbell's motion for summary judgment, ECF No. 15, **GRANT** the Commissioner's motion for summary judgment, ECF No. 18, and **DISMISS** this case from the Court's active docket.

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings

27

or recommendations made by the magistrate judge. The judge may also receive
further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the Jackson L. Kiser, Senior United States District

Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel

of record.

ENTER: November 20, 2014

Joel C. Hoppe
United States Magistrate Judge